IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **JAMES PERRY,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Action No.: 2:06-cv-00502-MEF** |
| | * | |
| **FLEETWOOD ENTERPRISES, INC.; et al.** | * | |
| | * | |
| **Defendants.** | * | |

---

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS BASED UPON PREEMPTION

Plaintiff James Perry, by undersigned counsel, files this Memorandum in Opposition to Defendants' Motion to Dismiss.

### INTRODUCTION

The Federal Manufactured Home Construction and Safety Standards Act, 42 U.S.C. § 5401 et. seq., went into effect June 15, 1976 and is commonly referred to as the "HUD Code." In addition, and relevant to this case, are the Manufactured Home Construction and Safety Standards, 24 C.F.R. § 3280, et. seq., (the "Standards") and the Manufactured Home Procedural and Enforcement Regulations, 24 C.F.R. § 3282 et. seq. (the "Regulations").[1]

Plaintiff seeks redress for the alleged failure of these Defendants to comply with these provisions. Further, Plaintiff has alleged that these Defendants have knowingly chosen to build homes to a known defective optional standard (when other reasonable options existed) under 24

---

[1] Collectively, the HUD Code, the Standards and the Regulations shall be referred to as these "provisions" when it is not

C.F.R. § 3280.504. Under Defendants' argument on preemption, they could choose to build under any of the condensation control options available to them under the Standards, albeit one which they know does not work, and never be sued. This would mean that these Defendants can knowingly put a defective product into commerce when other reasonable options not only existed, but existed for the very reason needed to comply with the HUD Code and the consumers would have no recourse against these Defendants.

Defendants misrepresent the HUD Code, the HUD Standards, the HUD Regulations and the case law. First, Defendants fail to cite altogether material relevant portions of the HUD Code (e.g. the saving clause) which states:

> Compliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law.

42 USC § 5409 (c). Defendants also fail to cite to the language in the waiver itself[2] (the Regulations): "Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR 3280.303(b) of the Standards."[3]

Second, Defendants cite the first part of a section of Code it alleges supports preemption and then literally stop in the middle and neglect to mention the very next sentence. For example, Defendants cite, 42 USC § 5403(a)(1)(A)(ii) but fail to cite subsection (iii) (performance-based

---

necessary to specify one.

[2] In March, 2000, HUD issued a waiver to 24 CFR Part 3280.504(b)1 for homes cited in hot and humid climates which allowed manufacturers to place a vapor retarder on the outside and remove it from the inside a/k/a "living" side of the walls. (*See* Exhibits 1 and 2). No such vapor retarder was ever required to be placed on the living side under 280.504(b)2 or (b)3 and there always existed a "blanket" alternate option which enabled the manufacturer to build the home in any manner necessary to make it perform.

[3] *See* Exhibit 2 attached hereto Final Rule dated April 24, 2002, Part IV Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver;

2

standards)[4] Defendants misrepresent the holding of the Supreme Court and its relevance to this case in *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) and, again, fail to provide the full text of a quote, literally cutting it off in the middle and twisting its meaning.

Third, Defendants misrepresent (or misunderstand) the actual exhibits it attaches to its Motion by misstating the date upon which the "waiver" became applicable (March, 2000 due to the "immediate need" found by HUD and not April 2002 as Defendants state).[5] This entire line of argument by Defendants, even if it had accurately stated the date the waiver could have been utilized, is irrelevant in any event since the HUD Code is by and large a performance based Code, the Standards provided the manufacturer with options suitable for geographical specific locations (plus a blanket alternative option) and has always required that:

> All construction methods shall be in conformance with accepted engineering practices to insure durable, livable and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades.[6]

24 CFR 3280.303(b) *Construction.* Defendants are perverting the intent and purpose of the HUD Code and attempting to confuse this Court by failing to fully inform it of the well-settled case law directly on point and the express language of the HUD Code and related provisions.

## A.    PREEMPTION STANDARDS

In general, federal pre-emption of state statues, local ordinances and/or common law claims can occur in three ways: (1) Congress may pass a statute that by its express terms pre-empts state

---

Final Rule" at page 20401.

[4] *See* page 5 ¶ 16 of their Motion to Dismiss.

[5] *See* Exhibit 1 attached hereto Preliminary Waiver dated March 30, 2000, Part III Department of Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Proposed Rule" at Summary Section.

[6] The placement of a vapor retarder on the living side of the wall in a hot and humid climate such as is present in this case is in direct violation of accepted engineering practices.

3

law; (2) Congress may imply that it is pre-empting state law by occupation of an entire field of regulation, so that no room is left for supplementary regulation; or (3) where Congress speaks neither expressly nor impliedly of pre-emption, state law is pre-empted to the extent that it actually conflicts with federal law. Such a conflict occurs when compliance with both state and federal law is impossible or when state law stands as and impediment to federal purpose. *See English v. General Elec. Co.*, 496 U.S. 72, 110 S. Ct. 2270, 110 L. Ed. 2d 65, 5 I.E.R. Cas. (BNA) 609, 14 O.S.H. Cas. (BNA) 1609, 115 Lab. Cas. (CCH) P56262, 113 Pub. Util. Rep. 4th (PUR) 97 (1990), as quoted in *Choate v. Champion Home Builders Co.*, 222 F. 3d 7888, Prod. Liab. Rep. (CCH) P 15870, 172 A.L.R. Fed. 691 (10th Cir. 2000).

### 1. **Express Preemption**

If this Court were to solely rely on reading Defendants' Motion to Dismiss in rendering an opinion in this case, it would not know that the HUD Code expressly states:

> Compliance with any Federal manufactured home construction or safety standard issued under this title does not exempt any person from any liability under common law.

42 USC § 5409 (c). It would not know that the final waiver itself expressly states:

> Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR 3280.303(b) of the Standards.

*See* Exhibit 2 at page 20401; *See also* 24 CFR 3282.402(a) ("Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any contract or applicable law."). Additionally, 24 C.F.R. 3282.11 (c) makes it clear that that Plaintiff is entitled to bring their action: "…A State may establish or continue in force consumer protections, such as warranty or warranty performance requirements, which respond to individual consumer complaints …" If Plaintiff's

4

claims were expressly (or impliedly for that matter) pre-empted, none of these sections would have been written.

Plaintiff respectfully suggests that any argument that the claims herein have been expressly preempted is baseless.

### 2. Implied Preemption

The next question which this Court must determine is whether Congress implied that it is pre-empting state law by occupying the entire field of regulation, so that no room is left for supplementary regulation. Is State law pre-empted because it actually conflicts with federal law? Such a conflict occurs when compliance with both state and federal law is impossible or when state law stands as an impediment to federal purpose.

First, Plaintiff is not attempting to hold Defendants to a different State standard but merely alleging that these Defendants have violated the HUD Code / Standards and/or Regulations themselves. The question as to whether there is an actual conflict with federal law or if it is impossible to comply with both state and federal law is moot, since that is not being alleged.

Defendants are thus left arguing that being held to have violated these provisions themselves stands as an impediment to a federal purpose – as backwards as that sounds. As shown below, Plaintiff respectfully suggests that nothing in the provisions suggests that a federal mandate is being impeded by this lawsuit and, to the contrary, the federal purpose of ensuring safe and durable housing is being advanced through the provisions contemplated by Congress and HUD listed herein. Stated differently, after reading the entire HUD Code, Regulations and/or Standards, **to argue that a manufacturer can never be sued (which is really what Defendants are saying) is contradictory to these provisions themselves.** The very essence of the HUD Code is a mandate that the home

meet certain performance based results (e.g. condensation control such that it not be trapped in walls) and thus the manufacturer is provided with several options (with geographic location a considered issue) to achieve the performance based result. As discussed below, even prior to the waiver only one of the options required a vapor retarder on the living side of the wall (24 CFR § 3280.504(b)(1)), while three others did not (24 CFR § 3280.504(b)(2) and (b)(3) and 24 CFR § 3282.14; *See also* 24 C.F.R. § 3280.10 *Use of alternative construction*. The waiver simply provided yet another option for the manufacturer to enable it to deal with the hot and humid climate found in the Gulf Coast.

> a. **The language of the HUD Code demonstrates that Congress did not intend to impliedly occupy the entire field of manufactured housing standards but rather created performance based standards.**

To begin with, again, if this Court were to solely rely on Defendants' Motion, it would not know that the standards are performance based because Defendants fail to fully cite the section of the statute upon which they rely:[7]

42 U.S.C. § 5403. Construction and safety standards:

(a) Establishment.

(1) Authority. The Secretary shall establish, by order, appropriate Federal manufactured home construction and safety standards, each of which—

(A) shall—

(i) be reasonable and practical;

(ii) meet high standards of protection consistent with the purposes of this title [42 USCS §§ 5401, et seq.]; and

(iii) be performance-based and objectively stated, unless clearly inappropriate.

---

[7] The highlighted portions were left off of Defendants' Motion

*Id.* (emphasis supplied). Defendants latch onto to the words "high standards" and seem to argue that this means that each respective option is equal (exactly why this is supposed to mean that remains unclear). Nonetheless, the very next section tells us that these provisions are designed to be, by and large, performance based "unless clearly inappropriate." It is clearly inappropriate when the provisions mandate that the manufacturer has no choice and, in these very limited cases, the Code is prescriptive. Even then, the manufacturer has always been equipped with the ability to seek to use any method it wants (even if they go against prescriptive requirements) as long as it meet or exceeds the standards. *See* 24 CFR § 3282.14. There is nothing in these provisions mandating that these homes be sold in the condition Defendants have chosen nor that they be sold at all, given the known defects as alleged herein.

Nonetheless, a full and honest reading of these provisions demonstrates that the Secretary followed the federal mandate and, by and large in general and specifically with respect to the issues in this case, created a performance based Code with numerous options at the disposal of the manufacturer to insure durable housing.

The Regulations themselves again tell us these are performance based Codes. The definition of the Federal manufactured home construction and safety standard follows: "…a reasonable standard for the <u>construction, design, and performance of a manufactured home</u> which meets the needs of the public including the need for <u>quality, durability and safety.</u>" 24 C.F.R. § 3280.2 (emphasis supplied).

Defendants also fail to fully cite 42 U.S.C. § 5403 (g) and the portion left off states that

alternative approaches must be given so that the manufacturer can achieve or exceed the minimum

performance based objectives of the Code:[8]

> 42 U.S.C. § 5403 (g) Manufactured housing construction and safety standards. (1) The Federal manufactured home construction and safety standards established by the Secretary under this section shall include preemptive energy conservation standards in accordance with this subsection.
>
>   (2) The energy conservation standards established under this subsection shall be cost-effective energy conservation performance standards designed to ensure the lowest total of construction and operating costs.
>
>   (3) <u>The energy conservation standards established under this subsection shall take into consideration the design and factory construction techniques of manufactured homes and shall provide for alternative practices that result in net estimated energy consumption equal to or less than the specified standards.</u>

*Id.* (emphasis supplied). The HUD Code is replete with language that preserves the rights of the

homeowner and demonstrates that Congress did not intend to impliedly occupy the entire field:

"Nothing in this subpart or in these regulations shall limit the rights of the purchaser under any

contract or applicable law." 24 CFR 3282.402(a). Further, 3282.14 Alternative construction of

manufactured homes expressly provides:

> (a) Policy. In order to promote the purposes of the Act, the Department will permit the sale or lease of one or more manufactured homes not in compliance with the Standards under circumstances wherein no affirmative action is needed to protect the public interest. The Department encourages innovation and the use of new technology in manufactured homes. Accordingly, HUD will permit manufacturers to utilize new designs or techniques not incompliance with the Standards in cases: (1) <u>Where a manufacturer proposes to utilize construction that would be prohibited by the Standards;</u> (2) <u>Where such construction would provide performance that is equivalent to or superior to that required by the Standards;</u> and (3) <u>Where (i) compliance with the Standards would be unreasonable because of the circumstances of the particular case,</u> or (ii) the alternative construction would be for purposes of research, testing or development of new techniques or designs.

---

[8] The highlighted portions were left off of Defendants' Motion.

24 CFR § 3282.14 (emphasis supplied); *See also* 24 C.F.R. § 3280.10 Use of alternative construction "Requests for alternative construction can be made…"). This section thus gives the manufacturer yet one more option with which to comply with its mandate of safe and durable housing, as long as they meet or exceed the minimum based performance standards.

Defendants argue that Plaintiff "in effect, criticize HUD's design and engineering principals by contending that Fleetwood is liable under state laws for complying with one of HUD-mandated options." *See* Defendants' Motion at page 6, footnote 1. Defendants also state that the HUD Code "…precludes a State from setting standards of construction and safety that conflict with standards covered by these Federal Standards." *See* Defendants' Motion at page 3 ¶ 11.

Plaintiff neither seeks to criticize HUD's design principals nor establish a conflicting State based standard. To the contrary, Plaintiff alleges that Defendants are in violation of the very HUD design principals that were established to protect consumers. The language of the HUD Code and the Regulations demonstrate that the manufacturers are left with wide discretion to be able to insure durable, livable and safe housing. 24 C.F.R. 3280.303(b).

**b.  Case Law interpreting the HUD Code supports Plaintiffs.**

In *Bott v. Sterling Homes, Inc. et. al.*, 527 So. 2d 548 (La. 1988), the manufacturer attempted to use the very same argument that Defendants in this case attempt to use. Perhaps not coincidentally, *Bott* involved moisture problems in the walls, among other things. In *Bott,* the Plaintiff complained of manufacturing defects primarily related to the presence of numerous water leaks around the mobile home's top, sidewalls, doors, and windows. *Id.* at 548. At trial, the Court entered judgment against the manufacturer on behalf of the Plaintiff and further indemnified the seller / installer from liability against the manufacturer. In the appeal, the manufacturer: "… urge[d]

9

that once a home is built in accordance with the standards set out in the "Code," then it can *never* be found to be redhibitorily defective." *Id.* at 549. (emphasis in original). The Appellate Court in affirming the Trial Court stated:

> However, as correctly stated by counsel for plaintiff in his appellate brief, this is a very narrow interpretation of *La. R.S. 51:911*-23(F). We find that the correct interpretation of the statute was stated by Mr. Dave Aymonds, an inspector for the State Fire Marshall's office. <u>Aymonds testified that the HUD regulations are regulatory of the end-result or finished product and not the method by which the mobile homes are to be constructed</u>. This is important when considering the fact that the mobile home has severe water damage which is attributable to either water leaks or condensation. <u>Aymonds stated unequivocably that if either of these two conditions are present, it is in itself a violation of the standards</u>. Moreover, Aymond testified that upon inspection of the mobile home, he found it to be in a condition which is substandard under the regulations.
>
> Further support that the Federal regulations were properly considered can be found in the testimony of Mr. Dan Baird, an expert in Housing and Urban Development regulations. Baird opined that the water damage to plaintiff's home was most likely due to condensation <u>and that a home manufactured to HUD standards should not condensate</u>.[9]

*Id.* at 549-550. (emphasis supplied).

In the following cases, the courts held that, in general, the National Manufactured Housing Construction and Safety Standards Act of 1074 (42 U.S. C.A. 5504-5426) does not pre-empt state common-law claims.

In *Richard v. Fleetwood Enterprises, Inc,* 4 F. Supp. 2d 650 (E.D. Tex. 1998), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A. 5401 et seq.) does not, in general, pre-empt state causes of action. The court noted that the Act does not explicitly pre-empt state causes of action, and, in fact, the Act provides in 42 U.S.C.A. 5409 (c) that compliance with the federal standards does not exempt any person from liability under common law.

---

[9]  This is what Plaintiff Perry is complaining of as well.

In *Shorter v. Champion Home Builders Co.,* 776 F. Supp. 333 (N.D. Ohio 1991), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A. 5401-5426) does not pre-empt most tort claims regarding mobile housing. The court quoted one provision of the Act, 5403 (d), which states that the Act pre-empts the authority of local governments to establish construction or safety standards for manufactured housing. However, the court went on to quote another provision of the Act, 5409 (c), which provides that compliance with the federal standards for mobile homes "does not exempt any person from any liability under common law." The court concluded that these two apparently contradictory standards, when read together, establish that the Act pre-empts state-law standards, but does not pre-empt most state-law claims. The court added that nothing in the legislative history suggests that a state-law claim would frustrate the intent of Congress in reducing personal injuries in mobile homes.

In *Choate v. Champion Home Builders Co.,* 222 F.3d 788, Prod. Liab. Rep. (CCH) P15870, 172 A.L.R. Fed. 691 (10th Cir. 2000), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.A 5401-5426) does not expressly pre-empt common-law actions, nor does the Act occupy the field of construction and safety of manufactured homes exclusively, so as to impliedly pre-empt all common-law actions. The court noted that the Act contained, in 42 U.S.CA 5403 (d), an express pre-emption provision that could be read, standing alone, as pre-empting common -law tort actions. The Court also noted however, that the Act contained, in 42 U.S.C.A 5409 (c), a saving clause, which provides that compliance with federal standards does not exempt any person form liability under common law. The court observed that the United States Supreme Court had considered the effect of almost identical pre-emption and saving clause provision in another statute in *Geier v. American Honda Motor Co., Inc.,* 529 U.S 861, 120 S

Ct.1913, 146 L. Ed 2d 914, Prod. Liab. Rep. (CCH) P 19795 (2000). The Supreme Court's resolution of these two provisions, the instant court stated, was that the pre-emption clause was meant expressly to pre-empt only state statues and regulations, not common-law actions. The court added that a saving clause does not, by itself, foreclose an implied pre-emption argument but that it was not applicable in the instant case.

In *Turner v. PFS Corp.,* 674 So. 2d 60, Prod. Liab. Rep. (CCH) P 14439 (Ala. 1995), reh'g denied, (Feb 16, 1996), the court held that the National Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C.S 5401-5426), and regulations adopted under it, did not pre-empt state law tort claims at issue, because those claims asserted a failure to comply with federal standards themselves.[10] The court quoted the holdings of *Shorter v. Champion Home Builders Co.,* 776 F. Supp. 333 (N.D. Ohio 1991), that the Act pre-empts state law standards, but does not pre-empt most state law claims. The court declared that enforcing the federal standards through state tort law does not frustrate federal supervision of the manufactured housing industry, and only claims that impose different state standards are pre-empted. *See also Gackler Land Co. v. Yankee Springs Township*, 138 Mich App 1, 359 NW2d (1984) 226, aff'd (1986), 427 Mich 562, 398 NW2d 393 (Township zoning ordinance, regulating placement of mobile homes, was not preempted by National Manufactured Housing Construction and Safety Standards Act which was designed to provide for minimum construction for safety purposes).

The import of the *Turner, Shorter, Choate,* and *Richard* cases demonstrate the following points: 1) That claims asserted by plaintiffs in the present case are not preempted; 2) Congress and HUD have not expressly or impliedly preempted that field so as to preclude state law claims for the

---

[10] Again, this is what Plaintiff Perry argues in this case.

defects asserted in this action; and 3) that the type of claims asserted by Plaintiffs herein are expressly preserved by 3282.11 (c).

    **c.  The HUD Code, Standards and Regulations contemplate that it is the duty of the manufacturer to select one of several options to which to build homes such that they meet the performance based objective of controlling condensation within wall cavities.**

Congress did not intend to occupy the entire field impliedly as Defendants argue. To the contrary, options were left to the discretion of the manufacturer so that the performance based objectives could be obtained. Congress contemplated, because it was necessary, that certain prescriptive standards would not be appropriate in certain geographic locations. The HUD Code states that:

> … in recommending standards, regulations, and interpretations, and…in establishing standards or regulations or issuing interpretations under this section, [you] shall-- (3) consider whether <u>any such proposed standard is reasonable for the particular type of manufactured home or for the geographic region for which it is prescribed;</u>

42 U.S.C. § 5403(e) (emphasis supplied).

It is the responsibility of the manufacturer to choose from any one of a number of options to achieve the performance based objective, taking into account, among other things, geographic location. For example, 24. C.F.R. § 3280.504 Condensation control and installation of vapor retarders states:

> (1) In Uo Value Zones 2 and 3, ceilings shall have a vapor retarder with a permanence of not greater than 1 perm (as measured by ASTM E-96-93 Standard Test Methods for Water Vapor Transmission of Materials) installed on the living space side of the roof cavity.
>
> (2) <u>For manufactured homes designed for Uo Value Zone 1, the vapor retarder may be omitted.</u>

24. C.F.R. § 3280.504 (a) (emphasis supplied).[11]  Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida.  *See* attached Exhibit 3 § 3280.506 U/O Value Zone Map.  While a manufacturer might be able to argue preemption for failing to place a ceiling vapor barrier in Zones 2 or 3 since there is arguably no choice,[12] it cannot argue that the HUD Code / Regulations required that they had to do so in Zone 1.  Similarly, there is nothing precluding (nor mandating for that matter) the manufacturer from placing a ceiling vapor retarder in Zone 1 but if they choose to do so, they must insure that the home will perform, be durable and safe and not condensate.  If they choose to do so in Zone 1 they cannot claim preemption since they were given options with a mandate to insure that the home perform and be durable and safe and not condensate.  This is just one example of why the Code is by and large performance based.[13]

The very next section of the Regulations (one of the sections at issue in this case) has similar options:

> (1) Exterior walls shall have a vapor barrier not greater than 1 perm[14] (dry cup method) installed on the living space side of the wall, **or**

> (2) Unventilated wall cavities shall have an external covering and/or sheathing which forms the pressure envelope. The covering and/or sheathing shall have a combined permeance of not less than 5.0 perms. In the absence of test data, combined permeance may be computed using the formula: PTotal=(1/[(1/P1)+(1/P2)]) where P1 and P2 are the permeance values of the exterior covering and sheathing in perms. Formed exterior siding applied in sections with joints not caulked or sealed shall not be considered to restrict water vapor transmission, **or**

---

[11] The newest version of this section deletes paragraph 2 but the prescriptive requirement for Zones 2 and 3 remain and, as was the case previously, Zone 1 does not have the same prescriptive requirement.

[12] Again, the Code gives the manufacturer the option to use any alternate method to insure the home performs and is durable even when the Code appears to be prescriptive. Even in such allegedly prescriptive cases it would defy logic for a manufacturer to continue to build to a prescriptive standard if it knew the home would not perform.

[13] There are numerous examples of differing options for differing geographical regions in the Standards. *See e.g.* 24 CFR § 3280.305(c) Wind, snow, and roof loads (differentiating again between Zone I and Zones II and III); 24 CFR § 3280.306 Windstorm Protection (differentiating again between Zone I and Zones II and III).

[14] The lower the perm, the less permeable the material.

(3) Wall cavities shall be constructed so that ventilation is provided to dissipate any condensation occurring in these cavities.

24. C.F.R. § 3280.504(b) (emphasis supplied).

It is important to ask what is being required by section 3280.504(b). Is the requirement that a vapor barrier must be installed on the living side of the wall in Zone 1, or is it that the home achieve or exceed the performance based standard of condensation control to insure a durable home? Section 3280.504(b)(2) does not require a vapor retarder. Section 3280.504(b)(3) does not require a vapor retarder but merely that "… ventilation is provided to dissipate any condensation occurring in these cavities." Thus, two-thirds of the options that existed prior to the "waiver" being "implemented" did not require a vapor retarder on the living side. There exists yet another section even prior to the waiver found in 24 CFR § 3282.14 which allows "…new designs or techniques not incompliance with the Standards… in cases…[w]here such construction would provide performance that is equivalent to or superior to that required by the Standards;[15] and…where compliance with the Standards would be unreasonable because of the circumstances of the particular case." *Id.* This provides the manufacturer with the ability to make the house perform which is a mandated responsibility to insure durable and safe housing. There is simply nothing in this section, or anywhere in these provisions, which required that these Defendants do what they have been alleged to know would result in defective housing by placing a vapor barrier on the living side of the home in the hot and humid Gulf Coast region. Doing so (Plaintiffs allege) insures that moisture will be

---

[15] This section again highlights that these are minimum requirements and that the manufacturer may use alternative approaches that meet or exceed them.

trapped in the walls which is directly contradictory to the long ago established mandate of insuring that the home be durable.[16]

The now fifth option, the waiver, does not require that the vapor retarder be placed on the living side of the walls either. Thus, four-fifths of the options now available to the manufacturer do not require what the manufacturer implies is a federally mandated choice. The title of § 3280.504 is "Condensation control and installation of vapor retarders" and only one of the many options actually requires a vapor retarder on the living side. The performance based objective is controlling condensation and to suggest the manufacturer innocently complied with a HUD mandate by choosing one option over others is disingenuous.

Defendants are also alleged to have violated 24 C.F.R. § 3280.103(b)(3) which states, *inter alia*: "The ventilation system or provisions shall not create a positive pressure in Uo value Zones 2 and 3 or a negative pressure condition in Uo value Zone 1."[17] One of the many reasons you do not want a "negative air pressure" in Zone 1 (Alabama among others) is that you do not want to suck the hot, moist air into the home (which would then be trapped if you placed a vapor barrier on the living side as is alleged to have occurred here). This is yet another example of the geographic location being an important consideration for the manufacturer. Defendants could just as easily argue that since they built their homes to one of the standards (Zone 2 or 3), they cannot be sued but this would highlight the absurdity of their argument.

Section 3280.504(b) provides options by use of the word "or" and requires the manufacturer to choose one of these options so that the home will obtain a performance level of durable, safe

---

[16] Plaintiff also believes that these Defendants knew this and yet continued to profit from this region at the expense of the homeowner.

[17] Again, Zone 1 includes Texas, Louisiana, Mississippi, Alabama, Georgia, South Carolina and Florida. *See* attached Exhibit 3 § 3280.506 U/O Value Zone Map.

housing. The goal is to dissipate any condensation occurring in these cavities as stated in these subsections. HUD recognized that in humid and fringe climate areas, the manufacturer would need options to achieve the performance based objective of the Code and that, indeed, some construction techniques could be detrimental to this goal. Each option is thus not equal as Defendants urge. Publishing the alternatives provided manufacturers with an alternative that a manufacturer can use in the design and construction of manufactured homes that may be compatible with their construction techniques

It is important to note that four options were available to the manufacturer before the "waiver" was implemented in March 2000. The waiver now creates yet another option from which the manufacturer may choose to meet "their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR 3280.303(b) of the Standards." *See* Exhibit 2 at page 20401.

### d. *Geier v. Honda* is inapposite.

Defendants entire argument is based upon *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000). *Geier* involved a lawsuit by an individual who claimed that Honda should have provided an air bag as opposed to just a seat belt. The Department of Transportation ("DOT") not only concluded that the seat belt / air bag options were each equally as good but actually disfavored a mandatory air bag requirement for all cars in 1987 because, among other reasons, they wanted to foster an environment in which States were encouraged to pass seat belt laws. DOT thought seat belts were actually as safe as air bags (and certainly cheaper) *if* people actually used the seat belts.[18]

---

[18] "DOT believed that ordinary manual lap and shoulder belts would produce about the same amount of safety as passive restraints, and at significantly lower costs -- *if only auto occupants would buckle up*." *Geier* at page 880.

DOT actually stated that lawsuits such as that being brought by *Geier* defeated this purpose e.g. was impliedly preempted.[19] Defendants delight in quoting a portion of the case in G*eier:*

> Without the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions, for, as we have just mentioned, it is possible to read the pre-emption provision, standing alone, as applying to standards imposed in common-law tort actions, as well as standards contained in state legislation or regulations. And if so, it would pre-empt all nonidentical state standards established in tort actions covering the same aspect of performance as an applicable federal standard, even if the federal standard merely established a minimum standard. On that broad reading of the pre-emption clause little, if any, potential "liability at common law" would remain. And few, if any, state tort actions would remain for the saving clause to save.

*Geier* at page 868. First, the entire premise of such a broad reading of a pre-emption clause is stated in the first sentence: "[w]ithout the saving clause, a broad reading of the express pre-emption provision arguably might pre-empt those actions…" *Id.* (emphasis supplied). As shown however, the HUD Code has a "saving clause" and thus the premise is inapposite. Further, Defendants fail to cite the very next portion of this quote which is necessary to understand its meaning:

> We have found no convincing indication that Congress wanted to pre-empt, not only state statutes and regulations, but also common-law tort actions, in such circumstances. Hence the broad reading cannot be correct. The language of the pre-emption provision permits a narrow reading that excludes common-law actions. Given the presence of the saving clause, we conclude that the pre-emption clause must be so read.

*Geier* at page 868. The Court thus concludes: "We have just said that the saving clause *at least* removes tort actions from the scope of the express pre-emption clause. Does it do more?" *Geier* at page 868.

Determining this answer requires an in-depth analysis into the DOT and the policy applicable to seat belts v. air bags, their safety and their respective costs. As such, any comparison to the instant

---

[19] "We place some weight upon DOT's interpretation of FMVSS 208's objectives and its conclusion, as set forth in the

case at this point is meaningless since the DOT standards and HUD standards are obviously entirely different. There are numerous cases interpreting the HUD standards (set forth above) and none stands for the proposition, that the claims brought herein are preempted which may explain why Defendants are latching onto a case outside the relevant HUD standards.

The Supreme Court in *Geier*, in a 5-4 decision with a dissent which approximates the length of the majority opinion, ultimately concludes that the plaintiff's common law claims:

> ...would have required all manufacturers to have installed airbags in respect to the entire District-of-Columbia-related portion of their 1987 new car fleet, even though FMVSS 208 at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all. It thereby also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation deliberately imposed. In addition, it could have made less likely the adoption of a state mandatory buckle-up law. Because the rule of law for which petitioners contend would have stood "as an obstacle to the accomplishment and execution of " the important means-related federal objectives that we have just discussed, it is pre-empted.

*Geier* at page 881.

In the case at hand, HUD has specifically stated that these are performance standards and that they recognize that different parts of the Country require different options for the manufacturer. All options are not equally as good as were found in *Geier* and indeed the options for geographical location were created to ensure that the manufacturers comply with their mandate to insure durable safe housing. As shown, the HUD code is for the most part a performance based standard and the alternatives and the "waiver" were promulgated to permit a range of design options that can satisfy the goals of durable and safe housing. HUD recognized that in humid and fringe climate areas some construction techniques could be detrimental and thus, publishing the alternatives provided

---

Government's brief, that a tort suit such as this one would "'stand as an obstacle to the accomplishment and execution'" of those objectives" page 883.

manufacturers with an alternative that they could use in the design and construction of manufactured homes that may be compatible with their construction techniques.

### e. Defendants' argument on preemption defies logic.

Defendants argue that the "waiver" was implemented in April 2002 after Plaintiff's home was manufactured and thus, they imply, they could not have complied with it.[20] Besides being factually incorrect (the waiver was available in March 2000 due to "immediate" need),[21] this logic highlights why Defendants claim of preemption is unfounded. Regardless of when the waiver was implemented, under Defendants' argument on preemption, they could still to this day choose to build homes with the vapor retarder on the living side in the hot, humid climate of the Gulf Coast with impunity since they chose one of the options available to them under 24 C.F.R. § 3280.504(b), albeit the one which they know does not work. Under their theory of preemption they could still - today - choose the (b)(1) vinyl option and never be sued since, in their words, "…Fleetwood used…one of three condensation control options from which manufacturers are required[22] to choose…" Defendants' Motion at page 4 ¶ 13. This would mean that they can knowingly put a defective product into commerce when other reasonable options not only existed but existed for the very reasons needed to comply with the HUD Code: "All construction methods shall be in conformance with accepted engineering practices to insure durable, livable and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades."24 CFR

---

[20] *See* Defendants' Motion at Page 8 ¶ 23.

[21] *See* Exhibit 1 attached hereto Preliminary Waiver dated March 30, 2000, Part III Department of Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Proposed Rule" at Summary Section.

[22] Defendants attempt to twist the meaning of "required." Defendants want this Court to think they had no option and complied with a HUD mandate but they are indeed required to choose the proper option to insure the home is durable. Even at that, as shown, the alternative methods of 3282.14 have been available all along and thus Defendants were "required" to choose nothing except that their homes be durable

3280.303(b) *Construction*. This theory leaves homeowners like Plaintiff Perry,[23] who have a fifteen-year (15) mortgage without any recourse when their home is already deteriorating.[24] The HUD requirements do not preclude (in fact expressly permit) building to (b)(2), (b)(3) or to an alternate standard that meets or exceeds the Codes (not to mention the waiver).

The waiver itself tells us that it cannot be relied upon for this type of preemption argument even if it is complied with: "Complying with the provisions of the waiver does not relieve manufacturers of their responsibilities to use construction methods that result in 'durable, livable, and safe housing' as required by 24 CFR 3280.303(b) of the Standards."[25]

## CONCLUSION

There is simply no basis to argue express or implied preemption and no Court has ever found so. Defendants are perverting the language as well as the intent and purpose of this performance based Code. Plaintiff respectfully requests that Defendants' Motion to Dismiss be denied and that this Court grant such other relief as is just.

---

[23] Specifically, Plaintiff Perry has a 15 year mortgage, amount financed $64,097.77, an APR of 12.25%, and monthly payments $779.62.

[24] The HUD Code already acknowledges this need: "The Secretary shall develop a new standard for hardboard panel siding...taking into account durability, longevity, consumer's costs for maintenance... The new performance standard developed shall ensure the durability of hardboard sidings for at least a normal life of a mortgage with minimum maintenance required. 42 U.S.C. § 5403 (h) (emphasis supplied).

[25] *See* Exhibit 2 attached hereto Final Rule dated April 24, 2002, Part IV Housing and Urban Development 24 CFR Part 3280 "Condensation Control for Exterior Walls of Manufactured Homes Sited in Humid and Fringe Climates; Waiver; Final Rule" at page 20401.

/s/ Charles Lance Gould
C. LANCE GOULD (GOU007)
Attorney for Plaintiffs

**OF COUNSEL:**

**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103
(334) 269-2343
(334) 954-7555 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the original of the foregoing document in this Court and served a copy on the following by U.S. Mail on this the 18th day of July 2006.

/s/ Charles Lance Gould
OF COUNSEL

**Attorneys for Defendants**
**Fleetwood Enterprises, Inc. and**
**Fleetwood Homes of Georgia, Inc.**
James F. Crosby
Hendrick S. Snow,
CROSBY SAAB, LLC
6404 Hillcrest Park Court
Mobile, Alabama 36695

Winston Edwards
David Hilyer
CRADDOCK, RENEKER & DAVIS, LLP
4142 Carmichael Road, Suite C
Montgomery, AL  36106